**In re FOODSOURCE, INC., Debtor.**

**In re FOODSOURCE SALES CORPORATION, Debtor.**

**Charles E. SIMS, et al., Plaintiffs,**

**v.**

**Charles DUCK, et al., Defendants.**

**Bankruptcy Appeal No. C–90–2336 EFL.**

United States District Court,
N.D. California.

July 16, 1991.

Timothy A. Colvig, Lempres & Wulfsberg, Oakland, Cal., for Charles E. Sims, trustee.

David Bordon, Sedgwick, Detert, Moran & Arnold, San Francisco, Cal., for Fidelity and Deposit Co. of Maryland.

Peter C. Haley, Knecht, Haley, Lawrence & Smith, San Francisco, Cal., for Trans-America Ins. Co.

## MEMORANDUM OPINION

LYNCH, District Judge.

### I. SUMMARY

This case involves a dispute between sureties and a bankruptcy trustee over liability for certain defalcations that Charles E. Duck committed during his term as Chapter 11 trustee in the FoodSource consolidated bankruptcy proceedings. It comes on appeal from an interlocutory order of the federal bankruptcy court for the Northern District of California. This Court has jurisdiction pursuant to 28 U.S.C. section 158(a).

The issue on appeal is whether a surety that issues a Chapter 11 bankruptcy trustee bond subsequent to the filing of the initial trustee bond is liable for defalcations committed prior to the time it issued the latter bond. Based upon its review of the relevant bankruptcy statutes, bankruptcy rules, common law decisions, and the circumstances of this case, the Court affirms

the decision of the bankruptcy court in part, reverses in part, vacates in part, and remands the case for further findings in accordance with this Opinion.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On January 29, 1985, Mr. Charles E. Duck was appointed Chapter 11 trustee in the consolidated bankruptcy proceedings of FoodSource, Inc. and FoodSource Sales Corporation. Over the course of the next five days, Insurance Company of North America ("INA") issued two trustee bonds as surety for the performance of Duck's duties as trustee, pursuant to Bankruptcy Code section 322. Their aggregate sum was $67,500.

About two years later, the first surety whose liability is now at issue entered the picture. On December 18, 1987, Fidelity Deposit Company of Maryland ("F & D" or one of the "Sureties"), issued trustee bonds, in aggregate amount of $3 million, as surety to Duck as trustee in the Food-Source proceedings. They were filed and approved by the bankruptcy court twelve days later. They stated, in pertinent, part:

"Charles Duck ... shall obey such orders as said Court may make in relation to said trust, and shall faithfully and truly account for all the moneys, assets, and effects of the estate of the said Bankruptcy which shall come into his hands and possession and shall in all respects faithfully perform all his official duties as said trustee...."

According to Judge Jaroslovsky, Duck posted the F & D bonds in conformity with the bankruptcy court's requirement, at that time, that a trustee's bond be increased to match any increases in cash brought into the estate. *See Haley, et al. v. Duck, et al.*, A.P. No. 1-89-0248, memo. of decision at 1 (U.S.Bkrptcy.Ct. N.D.Cal. May 27, 1990). A few months earlier, in an order dated September 28, 1987, Judge Jaroslov-

sky had authorized Duck to sell some assets of the FoodSource estate that would result in the receipt of approximately $1.8 million in cash.

The second surety whose liability is at issue became involved about two years later. On February 17, 1989, Transamerica (one of the "Sureties") issued two bonds in the aggregate amount of $2 million as surety for Duck as trustee in the Food-source bankruptcy proceeding. Their pertinent language was identical to that of the F & D bonds quoted *supra*.[1]

Duck embezzled extensively from the FoodSource bankruptcy estate during his term as trustee. He resigned the position on or about May 16, 1989[2] and plead guilty to two counts of embezzlement by trustee in violation of 18 U.S.C. section 153 on January 19, 1990.

It is undisputed, based on financial reviews conducted by certified public accountants, that Mr. Duck's *modus operandi* was to commingle funds from various bankruptcy estates, including funds of FoodSource at least as early as April, 1987, in a separate account at the Exchange Bank. Although he did make payments out of the Exchange Bank account on behalf of FoodSource bankruptcy estates, he also siphoned off significant sums from the commingled Exchange Bank account either to personal accounts or for personal use.

Two certified public accountants have prepared financial reviews or audit reports that examine the financial activity of the FoodSource bankruptcy estate during Duck's trustee term. One report, prepared by Mr. Larry Carr, a certified public accountant retained by the successor trustee, indicates that Duck, *prior* to the date the Sureties' bonds came on, disbursed Food-Source funds to professionals without court approval, a potential violation of 11 U.S.C. section 327. In addition, the report

---

1. For the sake of brevity, only Transamerica and F & D, whose bonds' coverage are at issue here, shall be referred to as the "Sureties." INA, whose liability upon its bonds is not at issue, shall be referred to by its acronym.

2. Ms. June Taylor Haley succeeded Duck as trustee and commenced this action. Ms. Haley has been succeeded in turn by Mr. Charles E. Sims, the current trustee. For the sake of simplicity, Haley and Sims shall be referred to in the aggregate as the "successor trustee."

indicated that the amount of FoodSource bankruptcy estate funds paid in that could not be accounted for at the end of Mr. Duck's term was, at a minimum, $1,581,-000. A second audit report, conducted by Mr. Don VanLandingham, Sr., a certified public accountant retained by the United States Trustees, indicates an identical shortfall. Additionally, it indicates that: (1) Duck commingled funds from the Food-Source bankruptcy estate with those of other bankruptcy estates in the Exchange Bank account and (2) misappropriated amounts greater than $1,000 dollars from the Exchange Bank account to his personal account or use at least twenty-five times *prior* to the issuance of the Sureties' bonds at issue.

On December 14, 1989, the successor trustee of the FoodSource estate filed a complaint for, *inter alia,* breach of their respective bond contracts by INA and the Sureties for failure to pay unconditionally the entire amount of $1,581,000 embezzled by Duck. F & D and Transamerica had made payments to the successor trustee of $667,599.72 and $231,862.40, apparently upon the assumption that they were not liable for defalcations committed by Duck prior to their bonds' issuance. The first amended complaint prayed for, *inter alia,* damages for breach and a declaratory judgment of the extent to which each surety was liable for losses due to Duck's defalcations.

Trustee Sims and the Sureties filed cross-motions for summary judgment before the bankruptcy court on the issue of liability for defalcations committed prior to issuance of their bankruptcy trustee bonds. In Memoranda of Decision dated May 29, 1990 and May 31, 1990, the Honorable Alan Jaroslovsky held, as a matter of law, that the Sureties were liable for the defalcations committed prior to the issuance of their bonds. The Sureties, appellants herein, properly appealed to the U.S. district court pursuant to 28 U.S.C. section 158(a). At hearing on the matter on February 22, 1991, this Court *sua sponte* raised the question of whether the issue adjudicated by the bankruptcy court had been ripe for determination. The Court instructed the parties to file supplemental memoranda addressing the question of ripeness as well as the substantive issue determined by the bankruptcy court. They have been received and reviewed. Accordingly, to those issues the Court now turns.

## III. DISCUSSION

### A. Standard Of Review

The district court reviews the bankruptcy court conclusions of law *de novo. In re New England Fish Co.,* 749 F.2d 1277, 1280 (9th Cir.1984). The proper task of a district court reviewing a partial summary judgment of the bankruptcy court is, viewing the evidence in the light most favorable to the non-moving party, to determine under a *de novo* standard (1) whether there is no genuine issue of material fact and (2) whether the moving party was entitled to judgment as a matter of law. *Id.* at 1280; *M/V American Queen v. San Diego Marine Constr. Corp.,* 708 F.2d 1483, 1487 (9th Cir.1983).

### B. The Issue Is Justiciable Because The Court's Opinion Will Not Be Merely Advisory

The issue presented is ripe for determination because it is clear, even before a final accounting of Duck's trustee term is rendered, that the Court's opinion will not be advisory, but rather will affect the rights and liabilities of the parties. A fundamental limitation on federal judicial power is Article III's prohibition upon advisory opinions. The Supreme Court explained the purposes served by the rule in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), stating that:

> [the rule against advisory opinions] implements the separation of powers [and] also recognizes that such suits often are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests.

*Id.* at 96–98, 88 S.Ct. at 1950–51. Consequently, justiciability requires that (1) there be an actual dispute between adverse litigants and (2) there be a substantial likelihood that the federal court's decision will "have some effect" or bring about change. *See generally,* E. Chemerinsky, *Federal Jurisdiction,* § 2.2 (1989).

The instant appeal satisfies the first requirement. The successor trustee has sued F & D and Transamerica for breach of their respective bond contracts. The Sureties have made only partial payment of amounts embezzled by Duck, based on their position that they are not liable for defalcations that occurred prior to their bonds' issuance. Thus, the two sides are in controversy over whether liability extends to funds misappropriated prior to the issuance of the Sureties' bonds, and a determination is material to the existence and to the extent of a breach of their bond contracts.

The second requirement of justiciability is met because this order will have effect. Both parties acknowledge that a final accounting of Duck's trustee term, which should prove complex, has not been completed. At oral argument, counsel for the successor trustee suggested that Duck's liability might not attach until the final accounting, and, consequently, nor would the Sureties'. As a consequence, a determination that the Sureties were liable for unlawful defalcations committed prior to their bonds came on might have no effect.

The state of the law, the facts, and the terms of the bond indicate that nevertheless it is substantially likely this Court's determination on the issue will have effect and not be enfeebled by being merely advisory. Although there is a split of authority, a majority of courts generally hold that a court action upon a court-fiduciary bond may not occur until liability has been fixed by a final accounting. Annot., 119 A.L.R. 84. However, special circumstances have been held to relax the requirement of a final accounting, such as where the court-fiduciary has been removed or resigns his office and a final accounting is immaterial to whether certain conditions of the bond have been breached. In *Wann v. People,* 57 Ill. 202 (1870), the Illinois state court held that where a final accounting is immaterial to certain breaches of the bond's conditions, an action upon the bond may be maintained prior to a final accounting. *See also Alexandrou v. Alexander,* 37 Cal. App.3d 306, 112 Cal.Rptr. 307 (1974) (citing to *Wann*).

Such is the case at bar. Trustee Duck resigned prior to making the final accounting of the trust. The successor trustee's complaint alleges that the Sureties are liable for Duck's failure to account and pay over moneys due when he resigned, and for unlawful acts such as commingling, conversion, and unauthorized payments without court order. The terms of the bond guarantee Duck's actions in three manners: (1) obedience to court orders; (2) accounting for moneys; and (3) faithful performance of his duties. By its terms, the surety is liable if he fails to fulfill any one of those categorical duties.

The record set forth above indicates that at the minimum some failure to perform duties faithfully, defalcations in the forms of commingling, conversion, and embezzlement from the FoodSource bankruptcy estate, occurred prior to the date the Sureties' bonds came on.[3] It is therefore substantially likely, if not certain that, Duck incurred some liability for defalcations committed prior to the execution of the bonds at issue. A final accounting appears necessary to fix the extent of liability, rather than the existence of liability. Therefore this case fits the exception, noted in *Wann* and *Alexandrou,* where the trustee left prior to a final accounting and one of the trustee's breaches at issue is unrelated to the final accounting. Because it appears

---

**3.** The audit reports thus far conducted indicate that FoodSource's funds were commingled with other estates in the Exchange Bank account and that Duck converted funds from that account to his personal account numerous times prior to the issuance of the bonds of F & D and Transamerica. In addition, during that period, Duck disbursed funds for professional services numerous times without court authorization, a potential violation of 11 U.S.C. §§ 324, 330 and Bankruptcy Rule 2012.

clear that defalcations occurred prior to the issuance of the bonds here at issue, and the fact of certain breaches of Duck's trustee duties, for acts such as conversion, commingling, or failure to account and pay over money in the estate, can be established without a final accounting, there exists the requisite "substantial likelihood" that a determination whether the bonds cover defalcations prior to their issuance will effect the rights and liabilities of the parties.

### C. The Issue Is Ripe For Determination Because The Question Presented Is Purely Legal

■ Courts may find that an issue lacks ripeness where the factual record or background is insufficiently developed to admit of the issue's adjudication. The issue of whether a later-filed, additional court-fiduciary bond covers defalcations committed prior to its issuance is a legal one and can be resolved by the Court. The bankruptcy court addressed this legal issue. However, the bankruptcy court adopted, as shall become clear, an overly-broad construction of the general majority position as the applicable rule. Moreover, the bankruptcy court found coverage without making the factual findings necessary to warrant coverage under the correct rule set forth herein. Therefore, the Court reviews on appeal the bankruptcy's court legal finding as to the applicable rule, but must remand the opinion of the bankruptcy court for findings of ultimate fact in accordance with this Opinion.

### D. The Bankruptcy Court's Decision

The bankruptcy court ruled that the bonds of the Sureties applied retrospective-

ly, covering all defalcations committed by Duck prior to the date of their issuance. The court's reasoning can be divided into three subsidiary legal findings and one finding of ultimate fact:

(1) the sureties bonds were statutory bonds under 11 U.S.C. section 322 and governed by Bankruptcy Rule 2010;

(2) bonds issued pursuant to section 322 must substantially comply to Official Form No. 25; therefore, the court could properly disregard the terms of abrogated Form No. 23 employed, and interpret liability based upon terms in substantial compliance with Official Form No. 25;

(3) a later-filed, additional trustee's bond issued pursuant to section 322 is liable for defalcations and misappropriation that occurred prior to its issuance within the trustee's term; and

(4) based upon these legal determinations, as a matter of ultimate fact, the Sureties' were liable for any of Duck's defalcations as trustee prior to the issuance of their respective bonds.

### E. The Court Affirms The Bankruptcy Court's Finding Of Law That The Sureties' Later–Filed Bonds Were Statutory Bonds Pursuant To 11 U.S.C. Section 322(b)

■ This threshold legal issue has significance because it affects whether the bonds' terms should be read to conform to Official Form No. 25 and whether, if issued pursuant to a federal statute, the bonds should be interpreted according to federal common law, rather than California law.

In order to determine whether the Sureties' bonds were issued pursuant to 11 U.S.C. section 322, the Court examines first the plain language of the statute.[4] At the

---

**4.** At the outset, the Court rejects appellee's argument that one of the Sureties, F & D, has admitted that the bonds are statutory bonds pursuant to § 322 and therefore is estopped from denying it. The successor trustee's first amended complaint alleges that "pursuant to 11 U.S.C. § 322(a) ... F & D, as surety, duly executed and acknowledged a statutory bankruptcy trustee bond." In its answer, F & D denied that the bonds were issued "pursuant to 11 U.S.C. § 322(a)" and admitted only that they executed

and acknowledged a "statutory bankruptcy trustee bond."

The phrase "statutory bankruptcy trustee bond" is ambiguous because commas do not separate the modifiers. If "statutory" was set off by a comma, i.e., "statutory, bankruptcy trustee bond," it would be clear that F & D was admitting the bond was statutory. Absent the comma, the adjective "statutory" may be properly read to modify only "bankruptcy trustee," a noun clause. Consequently, F & D's answer is

time the bonds were issued, 11 U.S.C. section 322 of the federal bankruptcy code provided, in pertinent part:

(a) A person selected ... to serve as trustee ... qualifies if before five days after such selection, and before beginning official duties, such person has filed with the court a bond in favor of the United States conditioned on the faithful performance of such official duties.

(b) The court shall determine—

(1) the amount of a bond filed under subsection (a) of this section; and

(2) the sufficiency of the surety on such bond.

Section 322 contemplates a bond which must be issued on behalf of a bankruptcy trustee to qualify him to conduct his official duties. The Sureties argue that the statute, plainly read, appears to apply to bonds filed within five days of the trustee's selection and prior to the commencement of duties. However, the Sureties' bonds in question were filed two and four years after Ducks' selection and the start of official duties. Therefore, the Sureties contend, they are not encompassed by section 322 on its face.

However, the meaning of subsection (b)(2)—the court "shall determine" the amount of bonds under subsection (a)—is somewhat ambiguous. The use of "shall" may connote future action, and suggests that the court has the power to determine the bond amount in the future, i.e., to require it to be decreased or increased after the initial qualification. A practical view of the actualities of bankruptcy administration supports this reading. As assets come into or are disbursed from an estate, the bankruptcy courts have, in the past, exercised their discretion to require increases or decreases in the bond.

Appellee, the successor trustee, contends that the Sureties' later-filed, additional bonds are provided for within the statutory scheme because subsection (b)(1) of section 322 requires that the bankruptcy court shall determine the amount of the bond and the sufficiency of the surety; therefore statutory authority exists to require that a trustee's qualifying bond be increased through later-filed, additional bonds. Their argument is persuasive when illumined by the legislative history of section 322 and the former statutes and bankruptcy rules from which it was derived.

The Court is guided by the legislative purpose of the statute and the related tenets of statutory construction in its construction of former section 322. The Committee of the Judiciary for the United States Senate stated that the purpose of the Bankruptcy Reform Act of 1978 was to "modernize the bankruptcy law by codifying a new title 11 that will embody the substantive law of bankruptcy...." S.Rep. No. 95–989, 95th Cong., 2d Sess., at 1 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. "By its very nature a codification usually consists of a mere reiteration of the existing laws and is usually intended to state them in a more concise and related form. Therefore a code is generally presumed to have no altering ... effect upon the existing law, unless the intent is clearly expressed." N. Singer, *Statutes and Statutory Construction*, § 23.14 (4th ed. 1985). When viewed with this principle in mind, it is clear that Congress intended for later-filed, additional bonds which increase the trustee's amount of bond to be considered statutory bonds under section 322.

Section 322 was derived from section 50 of the Bankruptcy Act of 1938 which, prior to the Bankruptcy Reform Act of 1977, was codified at 11 U.S.C. section 78. *See Notes of Committee on the Judiciary, Senate*

---

open to the plausible, alternative reading that they admit merely that it issued the bond of statutory bankruptcy trustee, i.e., a trustee involved in a statutorily-governed bankruptcy, rather than to admit that the bond itself was issued pursuant to a statute. F & D's denial that the execution was pursuant to 11 U.S.C. § 322(a) increases the probability that it was

admitting only the former, rather than the latter.

Language is the stock in trade of lawyers. Ambiguous pleading cannot be relied upon to find an admission of fact where an equally-plausible, alternative reading of the answer undermines that reliance.

*Report No. 95–989,* quoted in annot. 11 U.S.C. section 322. Section 50 of the Act provided, in pertinent part:

(b) Receivers and trustees, before entering upon the performance of their official duties and within five days after their appointment ... shall qualify by entering into bond to the United States....

(c) The court shall fix the amount of receivers' and trustee's bonds and *may increase or decrease the amounts at any time when cause therefore appears.*

Bankruptcy Act of 1938, Pub.L. No. 75–696, 52 Stat. 863 (codified at 11 U.S.C. § 78, superseded in 1978) (emphasis added). Two aspects of the language are noteworthy. First, subsection (b) states that qualification occurs by "entering into bond to the United States," and therefore it emphasizes not the execution of a particular bond but rather the state of being bonded as a prerequisite to qualification. Second, subsection (c), indicating that the court has the authority to increase the amount of the bond, refers to trustee's *bonds,* in plural, rather than to a particular bond. Read in conjunction, the two sections suggest that the court could require an additional, increased bond, for good cause, for the trustee to retain his qualified status. Therefore, a later-filed, additional bond required by the court for cause would be "statutory" or "pursuant to" section 50.

These subsections of section 50 were superseded by Rule 212 of the Rules of Bankruptcy Procedure, subtitled "Qualifications by Trustee and Receiver." Former Rule 212 provided, in pertinent part:

(a) ... every trustee ... shall, before entering upon the performance of his official duties within 5 days after his election or appointment qualify by filing a bond in favor of the United States conditioned on the faithful performance of his duties.

(e) The court shall determine the amount of the bond and the sufficiency of the surety for each bond filed under this rule.

These subdivisions of Rule 212 were superseded by subsections (a) and (e) of section 322, and the language of the latter is obviously derived from the former. If the legislative intent of Rule 212 was merely to simplify and make more concise section 50, rather than to alter its substantive content, it would indicate that later-filed increased trustees bonds, which are clearly within the purview of section 50, should also be interpreted to have been encompassed by section 322 (as it stood at the time of the bonds' issuance). Such is the case.

Subdivision (e) of Rule 212 provided the court authority to increase a trustee's bonds. The Advisory Committee on Rules commented:

Subdivision (e) vests general authority and responsibility in the court for determining the adequacy of the bond and the sufficiency of the sureties thereon *in lieu of* the detailed provisions in subdivisions b, c, d, e, f and g of section 50 of the Act that deals with these matters.[5]

Subdivision (e) of Rule 212, which section 322(b) tracks verbatim, was therefore intended to be a general, less detailed version of, rather than an alteration of, section 50(c). Section 50(c) provided the Court the power to increase a trustee's bonds and encompasses later-filed increased bonds.

Appellee's argument is therefore correct. Section 50 contemplates later-filed, additional bonds ordered by the court in order for a trustee to remain qualified. Rule 212 was intended as a simplified version of section 50. Section 322 contains almost identical language to Rule 212. Therefore, the legislative history guides us to interpret section 322(b),[6] which empowers the court to "determine the amount" of the qualifying bond, to include the power to order additional bonds in order for the trustee to preserve his qualification. Such bonds, which would have been "statutory" or pursuant to the statute under old section 50, are properly interpreted to be pursuant to the statute under section 322. Accord-

---

**5.** 1976 Advisory Committee Note to Rule 212 (emphasis added).

**6.** As enacted at the time of the Sureties' bonds' issuance.

ingly, the bankruptcy court's finding on this issue is affirmed.

### F. Because The Sureties' Bonds Are Statutory Bonds Under Section 322, The Wording Of The Bonds Should Be Read To Substantially Comply With Official Form No. 25

█ The bankruptcy court properly ruled that the Sureties' bonds were issued pursuant to section 322 and governed by Bankruptcy Rule 2010. The Advisory Committee Note to Bankruptcy Rule 2010 provides that a bond filed pursuant to Rule 2010 should conform to Official Form No. 25.[7] The court relied upon 11 C.J.S. section 40(e) for the proposition that whatever the law requires be included in a bond must be read into it. The court then concluded that the law required the use of Official Form No. 25, and therefore the Sureties' bonds must be read to conform to the terms of Official Form No. 25 for the purposes of determining liability.

Appellant Sureties contend that the use of Official Form No. 25 verbatim is not a statutory mandate; Bankruptcy Rule 9009 mandates their observance but permits "alterations as may be appropriate." Sureties argue that they altered Official Form No. 25 by using the "prospective" language of old Official Form No. 23, its precursor. In addition, they contend that since the Sureties' bonds were issued to maintain the trustee's qualification because he was, in the future, going to receive more property into the estate, "alteration" of Form No. 25 to obligate the Sureties only as to the trust-

ee's future actions was "appropriate" under the circumstances.

The Court affirms the bankruptcy's finding, as a matter of law, that the wording of the bond should be read to conform to or substantially comply with Official Form No. 25. The Notes to Bankruptcy Rule 2010 state that Form 25 should be used with trustee's bonds like those at issue. Bankruptcy Rule 9009 requires that the Official Forms shall be observed and used. "The rule continues the obligatory character of the Official Forms...."[8] While it permits alteration of the Official Forms as appropriate, the use of the Official Forms has generally been held subject to a "rule of substantial compliance."[9] The Sureties cannot be said to have substantially complied with Official Form No. 25, with slight alterations; rather, the Sureties substituted, *in toto*, the Old Form No. 23, which was abrogated October 1, 1973. To allow parties to substitute abrogated precursor forms for the current Official Forms and then claim that the substitution was merely an "alteration" would render nugatory the obligatory nature of the Official Forms. The exception for alteration would swallow the rule of substantially compliance with the current Official Forms.[10] Parties would be free to use abrogated forms as opposed to the current forms, and later argue it appropriate, thereby defeating the rule's purpose of "facilitating the processing of the paperwork of bankruptcy administration." *Id.* Accordingly, the bankruptcy court determination that coverage under the bond should be interpreted as if its

---

7. Official Form No. 25 is derived from Official Form No. 23, which, despite its abrogation in 1973, the Sureties chose to use as the model for their bonds. Official Form No. 25 is distinguished from the latter in that it does not employ the term "shall," a term which might be interpreted to convey prospective action. Thus, old Official Form No. 23, and the Sureties' bonds, condition their obligation as sureties upon the condition, for example, that the trustee "shall" in all respects faithfully perform all his official duties as said trustee, etc. By contrast, Official Form No. 25 provides "as surety, we bind ourselves to the United States in the sum of $_____ for the faithful performance of the undersigned principal of official duties as trustee of the estate of the above-named debtor."

The Sureties maintain that the phrasing of their bonds, based upon abrogated Form No. 23, obligates them for only funds misappropriated subsequently to the date of the bond.

8. 1988 Advisory Committee Note to Rule 9009.

9. *Id.*

10. Indeed, if the Sureties' coverage would apply to retrospective and prospective defalcations under the Official Form No. 25, but only to prospective defalcations under the abrogated Form No. 23, then the use of the latter would effect a substantive change. Logically, abrogated Form No. 23 could not be said to be in "substantial compliance" with Official Form No. 25.

wording conformed Official Form No. 25 is affirmed.[11]

### G. Federal Common Law Governs The Issue Of Whether A Statutory Trustee Bond Issued Pursuant To 11 U.S.C. Section 322 Provides Coverage For Defalcations Committed Prior To Its Issuance

■ The bankruptcy court did not address the question of choice of law applicable to the issue of the bonds' coverage. However, it chose to apply a "majority rule" noted in certain treatises based on a survey of state law, rather than applying California state law. By so doing, the bankruptcy court appears to have assumed that the issue is one of federal bankruptcy law which ought to be governed by federal common law. Evidently faced with a dearth of federal authority, the bankruptcy court turned to a majority rule to serve as such a federal rule.

The Court finds that federal common law ought to govern the issue of whether and in what circumstances later-filed, additional statutory bonds under section 322 cover trustee defalcations predating their issuance, for two reasons. First, the issue appears to be one of federal bankruptcy law. The federal bankruptcy code, 11 U.S.C. section 322, mandates the creation of the obligation for a trustee to qualify in a federal bankruptcy proceedings. Federal bankruptcy rules mandate that the terms of obligation substantially comply to Official Form No. 25. Interpretation of a bond entered into because of a federal bankruptcy law mandate, whose terms are substantially-circumscribed by federal bankruptcy rules and official forms, appears to the Court an issue of federal bankruptcy law.

Second, federal law should control the interpretation of section 322 bonds because they are contracts to which the United State Government is in every case, by statutory mandate, a party as obligee.

[T]he courts have often held that state law is not applicable to contracts to which the federal government is party and have resorted to "federal law" to provide uniform rules. These cases include leases entered into by the Government and liquidated damage clauses in Government contracts. The basic view of these decisions is that the Government is a party to the action and drew up the contract pursuant to some federal authority. Because of the direct governmental relationship, the interest of the Government is assumed to be paramount over state interest.

E. Scoles, P. Hays, *Conflict of Laws*, § 3.52, pp. 140–41 (1984) (footnotes omitted). In *United States v. County of Allegheny*, 322 U.S. 174, 183, 64 S.Ct. 908, 913–14, 88 L.Ed. 1209 (1944), Justice Jackson noted that the "construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties ... all present questions of federal law not controlled by the law of any state." *Id.* (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943)). Subsequent decisions have applied that rationale to find that federal law controls the rights of parties under a lease executed by the United States. *See American Houses, Inc. v. Schneider*, 211 F.2d 881, 883 (3d

---

**11.** Even assuming, *arguendo*, that Official Form No. 25 should not control and that the terms of the abrogated Form No. 23 should obtain, it is in doubt whether its use of the word "shall" is necessarily one of futurity circumscribing its coverage to future acts. *See In re Estate of Camarda*, 103 Misc.2d 362, 425 N.Y.S.2d 1012, at 1016 (1980) (New York state court held that coverage of a bond stating that "the trustee shall faithfully execute the trust reposed" could include breaches of trust occurring prior to the issuance of the bond.)

Furthermore, even assuming, *arguendo*, that Form No. 23 should obtain and that its language is prospective only, it would not change the results in this case. The correct rule, set forth in section III.H. herein, would only predicate liability of the Sureties upon breaches of the duty to recover assets or the duty to account and pay over assets that occur *during* the terms of the Sureties' bonds, subsequent to their issuance. Part of the damages flowing from these breaches could include assets misappropriated prior to their issuance. However, the Sureties would not be liable for breaches of duties themselves that occurred prior to their bonds issuance.

Cir.1954) (federal law governs interpretation of lease executed by United States Government); *Girard Trust Co. v. United States,* 149 F.2d 872, 874 (3d Cir.1945) (federal law governs rights of parties in lease executed by Government). The Ninth Circuit has held, more recently, that the rights of the United States against private citizens with whom it has contracted in loan transactions are governed by federal law. *United States v. Ellis,* 714 F.2d 953, 954 (9th Cir.1983); *see also Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947) ("It is customary ... to apply to the construction of government contracts the principles of general contract law"). In the case at bar, section 322 requires the trustee to obtain a contract whereby a surety enters into bond for an amount in favor of the United States. Hence, the government is, in all bonds under section 322, the obligee. Moreover, Congress, through the federal bankruptcy statutes and rules, mandates that the terms of the bond substantially comply with Official Form No. 25. In conformity with the authority cited, the Court finds that federal law governs the interpretation of section 322 bonds in general, and the interpretation of liability under later-filed, additional section 322 bonds in particular.

The federal bankruptcy statute is silent upon the issue of when later-filed, additional section 322 bonds may be held liable for assets misappropriated prior to their issuance. Nor has research divulged any federal cases fashioning federal common law to address the issue. In such a case, "federal courts may look to other sources in developing federal common law, including the law of the states." *United States v. Ellis,* 714 F.2d at 955 (1983); *United States v. Best,* 573 F.2d 1095, 1101 (9th Cir.1978).

The bankruptcy court below took this path. It applied a broad "majority" rule, culled from treatises collecting state cases, which holds that later-filed, additional court-fiduciary bonds are cumulative and liable for the same defaults as the initial bonds. After examining the appellants' objections to the rule's general applicability,

the Court shall set forth a narrower construction of the rule, which is more consistent with the case law, to be applied in this case.

The bankruptcy court selected, as the applicable rule, a synopsis of the majority position set forth in an insurance treatise:

> The doctrine of relieving a surety of liability for prior defaults is not followed generally under certain classes of bonds, particularly those required in court proceedings for the protection of ... estates. For the protection of such persons or estates, broader rules of law are involved.... Nor can a surety in such event contend that the report on file when it became surety was untrue or that the conservator had embezzled funds prior to the surety's assumption of liability.

11 J. Appleman, *Insurance Law and Practice,* § 6713 (1981) (collecting cases). The bankruptcy court also cited to the following annotation:

> In cases where guardians, executors, administrators, or trustees have given bonds in character merely additional to former ones, that are not intended to affect, or at least not actually affecting the security afforded by the earlier obligations, it has usually been held that the later bonds are merely cumulative securities and holden for the same defaults as the earlier one.

Annot., *Liability of Sureties on Bond of Guarantor, Executor, Administrator, or Trustee for Defalcation or Deficit Occurring Before Bond Was Given,* 82 A.L.R. 583, 591 (1933) (collecting cases). The bankruptcy court found the Sureties liable for defalcations predating the Sureties' bonds in reliance upon this authority.

Appellants seek to defeat this rule's applicability by proffering two alternative rules that they contend apply in its stead. First, appellants argue that courts only find liability for prior defalcations under court-fiduciary bonds where the bond's wording or the governing statute require it. However, the Court notes that appellant's authority for this position, a treatise,

cites only a handful of cases.[12] In addition, the Court's research has disclosed many examples of exceptions to this position which discredit its standing as a "rule."

Where the terms of the statute are silent as to retrospective application, and the terms of a bond are general, and do not specifically require retrospective application, several cases have found liability for defalcations committed before the bond issued. For example, in the California decision, *Elizalde v. Murphy,* 163 Cal. 681, 126 P. 978 (1912), the bond was generally conditioned upon the faithful performance by the administrator of her duties. The court cited no statute requiring retrospective application. Nevertheless, the court found that where a later-filed, additional bond is conditioned upon the faithful performance of duties,

> It is settled beyond controversy that ... the surety ... becomes liable for the breaches of trust of the administrator committed prior to his becoming such surety, as well as for those committed subsequent thereto.

*Id.* at 688, 126 P. 978. This decision's continuing validity was reaffirmed in a recent New York state court opinion, which cited it with approval. *In re Estate of Camarda,* 103 Misc.2d 362, 425 N.Y.S.2d 1012 (1980). There, an additional bond had been executed which stated that the executrix "shall faithfully execute the trust reposed in her...." No statute was cited requiring retrospective application; nevertheless, the New York court found the surety liable for losses incurred prior to the bond's issuance. These decisions alone rebut appellant Transamerica's assertion that where court-fiduciary bonds are held retroactive, the holding is based upon either bond language or a statutory directive mandating it. Other cases where the courts found later-filed, additional court-fiduciary bonds liable for assets misappropriated or defalcations prior to their issuance, even though neither the wording of the bond nor a statute specifically required it, as well as cases following the minority position of "prospective" application, are collected in the footnote below.[13]

**12.** Bogert, *Trust and Trustees,* ch. 41 § 864 (1982). In addition, the cases relied upon by the treatise, for the contention that prospective wording of a bond requires a finding of solely coverage for prospective defaults, are distinguishable from the case of later-filed, additional trustee's bonds presented here. *State v. Hunter,* 73 Conn. 435, 47 A. 665 (1901) (a bond issued for court-fiduciary's duties as trustee does not cover prior defaults of court-fiduciary when acting as executor); *Thomson v. American Surety Co.,* 170 N.Y. 109, 62 N.E. 1073 (1902) and *State v. Banks,* 24 A. 415, 76 Md. 136 (1892) (*initial* bond filed after beginning of trustee's terms not liable for defaults prior to issuance). The remaining authority relied upon, *Lamar v. Walton,* 99 Ga. 356, 27 S.E. 715 (1897) enunciates such a rule without reasoning in support.

**13.** *National Surety Corp. v. Ellison,* 88 F.2d 399 (8th Cir.1937) (court-fiduciary bond conditioned generally on faithful performance of duties held liable for failure to account and breach of duty to make good even loss pre-dating the bond); *Beakley v. Cunningham,* 112 Ark. 71, 165 S.W. 259 (1914) (later-filed, additional guardian's bond liable for defalcations prior to issuance because guardian has continuing duty to preserve estate assets and to account); *Pinkstaff v. People,* 59 Ill. 148 (1871); *In re Tabasinsky's Estate,* 228 Iowa 1102, 293 N.W. 578 (1940) ("Reason and great weight of authority impel us

to hold that ... the sureties thereon are liable for defalcations occurring prior to the time of execution"); *Ellyson v. Lord,* 124 Iowa 125, 99 N.W. 582 (1904); *Knox v. Kearns,* 34 N.W. 861, 73 Iowa 286 (1887); *Douglas v. Kessler,* 7 N.W. 619 (1880), *aff'd on rehearing* 57 Iowa 63, 10 N.W. 313 (1881) (surety on additional bond conditioned generally on faithful performance of duties liable for defalcations prior to issuance because of duty to account); *Lindquist v. Thang,* 188 Minn. 437, 247 N.W. 506 (1933); *Bromen v. O'Connell,* 185 Minn. 409, 241 N.W. 54 (1932); *Mitchell v. Columbia Cas. Co.,* 111 Mont. 88, 106 P.2d 344 (1940); *Wilkins v. Deal,* 128 Neb. 78, 257 N.W. 486 (1935); *Bellinger v. Thompson,* 26 Or. 320, 37 P. 714 (1894); *Owens v. McMahan,* 122 Wash. 191, 210 P. 200 (1922).

A minority of cases find only prospective application. *See National Surety Corp. v. Williams,* 110 F.2d 873 (8th Cir.1940), *cert. denied, Williams v. National Surety Corp.,* 311 U.S. 674, 61 S.Ct. 40, 85 L.Ed. 433 (1940); *Sebastian v. Bryan,* 21 Ark. 447 (1860); *National Surety Co. v. Clark,* 48 Ga.App. 756, 173 S.E. 210 (1934); *Lamar v. Walton,* 99 Ga. 356, 27 S.E. 715 (1896); *Williams v. State,* 89 Ind. 570 (1883); *State ex rel. Bird v. Hood,* 7 Blackf. 127 (Ind.1844); *Cheney v. National Surety Corp.,* 256 A.D. 1041, 10 N.Y.S.2d 706 (1939); *Suffolk County Trust Co. v. National Surety Corp.,* 249 A.D. 639, 291 N.Y.S. 82 (1936).

Appellants' second argument is that the rule for "Official" bonds, which appellants maintains is one of "prospective" coverage only, applies with equal force to court-fiduciary bonds because they are a species of "official" bonds. Appellants rely upon a variety of cases which involve either officials or persons who are not court-appointed fiduciaries, or involve later-filed, initial bonds.[14] However, appellants fail to acknowledge that the courts have long distinguished the rule of liability for later-filed, additional bonds of court-appointed fiduciaries from the general rule applying to public official bonds:

> Between the coverage of the bonds of a guardian and those of public officers is a plain and controlling distinction. At the end of each term of a public officer there is usually ... a definite cut-off and audit marking the end of the old term and liquidating the incumbents' liabilities resulting from that term. That he succeeds himself is a mere circumstance.... The nature and limits of his stated term and the fact that any official wrongdoing affects only affairs of the current term distinguishes the status of a public officer from that of a fiduciary, such as a guardian. The latter does not serve for a fixed term. His duty is continuous from the beginning to end of his trust.
>
> Such is the logic of the rule ... which exempts sureties for a later [term] from liability for defalcations of an earlier official term. Its justifying basis does not exist in the case of sureties for guardians or other fiduciaries. They serve but one term, whereas a public officer who succeeds himself serves for successive terms. The duties of the one are unitary and continuous, those of the other divided into successive and definite periods. Hence, in the case of the public officer succeeding himself, the allocation of liability for wrong-doing [is] to the sureties for the term in which it was committed. If in the middle of his term, an officer gives a new bond conditioned for the faithful performance of his duty ... it must cover a defalcation occurring before the bond was given but during the term.... Under [guardian's] bonds, the sureties are liable for the failure of their principal to account even though the initial wrong-doing antedates the bond. The resulting duty to make good the loss continues to the end.

*Bromen v. O'Connell*, 185 Minn. 409, 241 N.W. 54 (1932) reported in 82 A.L.R. 583 (1933). In short, most authorities recognize court-fiduciary bonds as a distinct subclass within the category of official bonds.[15] They have been held subject to the special rule that later-filed, additional court-fiduciary bonds cover defalcations during the trustee's entire term, which, as the term is continuous, may have occurred prior to the bond's issuance. *Accord Waldrep v. Merkle*, 38 F.Supp. 165, 170–72 (W.D.Okla.1941); *see LaCoste v. Splivalo*, 64 Cal. 35, 30 P. 571 (1883); *Bellinger v. Thompson*, 26 Or. 320, 37 P. 714, 718 (1894) (general rule of prospective application of official bonds has "no application" to court-fiduciary bonds). Therefore, the Court rejects the contention that a separate rule for court-appointed fiduciary bonds should not be recognized in this case.

**14.** *See e.g. Town of Hamden v. America Surety Co.*, 93 F.2d 482, 486 (2nd Cir.1937), *cert. denied* 303 U.S. 648, 58 S.Ct. 647, 82 L.Ed. 110 (1937); *Platte County v. New Amsterdam Cas. Co.*, 6 F.R.D. 475 (D.C.Neb.1947); *Anaheim Union Water Co. v. Parker*, 101 Cal. 483, 487, 35 P. 1048 (1891); *State v. Banks*, 76 Md. 136, 24 A. 415, 416 (1892); *Van Sickel v. Buffalo County*, 13 Neb. 103, 13 N.W. 19 (1882).

**15.** The rule that public officials bond have "prospective application" is better-stated as a rule that such bonds extend coverage only to defalcations during a specific term of a public official, because they serve specific terms, at the end of which there is usually a definite cut-off and audit. By contrast, a court-appointed fiduciary, whose term is continuous and indefinite, does not have duties circumscribed within successive, separate terms. Hence, it is argued, bonds of court-fiduciaries cover any defalcations during the entire term, even those predating the bonds' issuance.

*H. The Common Law Decisions Indicate A Narrow Rule: Later–Filed, Additional Court Fiduciary Bonds Cover Prior Defalcations In Two Circumstances: (1) Where The Trustee Breaches A Continuing Duty To Recover Assets During The Term Of The Later–Filed Bond Or (2) Where The Trustee Breaches His Duty To Account For And Pay Over The Assets Of The Bankrupt-. cy Estate During The Term of The Later–Filed Bond*

■ The bankruptcy court erred when it applied a broadly-worded synopsis of the majority rule finding retrospective coverage. An analysis of the better-reasoned cases, and the majority of cases, supports the narrower rule that later-filed, additional court-fiduciary bonds are liable for assets misappropriated prior to their issuance only if either (1) the trustee commits a continuing breach to recover misappropriated assets to the estate, *during* the term of the later-filed bond, when he is solvent *or* (2) the trustee breaches his duties to account for and to pay over the estate's assets *during* the term of the later-filed, additional bond. In either case, the surety is held liable for breaches of the court-fiduciary's duties occurring *during* the term of their bonds. However, the damages flowing from these breaches, the failure to recover assets and the failure to account and pay over estate assets, encompass losses due to misappropriations or defalcations even if committed prior to the bonds' issuance.

### (1) The Continuing Duty To Recover Misappropriated Assets To The Estate.

■ One of the two well-reasoned rationales that courts have relied upon to find coverage for defalcations committed prior to the bond's execution is that a fiduciary who misappropriates or misapplies assets has, subsequently, a continuing duty to recover those assets to the estate. A court-fiduciary who fails to recover such misappropriated assets from himself is continually in breach. *See Bromen v. O'Connell*, 185 Minn. 409, 241 N.W. 54 (1932) (the duty to make good a loss by defalcation is a continuing one); *Beakley v. Cunningham*, 112 Ark. 71, 165 S.W. 259, 263 (1914) (guardian's failure to preserve assets of the estate until accounting was a continuing breach); 28 C.J. 1293, § 492; *Cf. National Surety Corp. v. Ellison*, 88 F.2d 399 (8th Cir.1937); *Mitchell v. Columbia Casualty Co.*, 111 Mont. 88, 106 P.2d 344 (1940) (acknowledging theory of liability predicated upon continuing breach).

The bankruptcy court based its holding in part upon the "continuing nature of the defalcations." The court inferred that the trustee's solvency was immaterial to the applicability of the "continuing breach" rationale. However, the majority of relevant cases have held that whether the continuing duty to recover misappropriated funds was breached depends upon the fiduciary being solvent at any time during the period of coverage of the later-filed additional bond. The logic supporting the requirement of solvency was set forth in *Aetna Indemnity Co. v. State*, 101 Miss. 703, 57 So. 980 (1911). There, a guardian was appointed for three minor children. Initial fiduciary bonds were issued. The guardian converted estate funds to his personal use during their term. Subsequently, the initial bonds were released and a subsequent bond came on the risk. In a suit upon the second bond, the court held that sureties on the second bond were liable for defalcation committed prior to the bond's issuance if he was solvent at any time during the period of the second bond:

A rule of law that would exculpate a guardian for failing to collect from himself, when he had wrongfully converted the funds of his ward, merely because the debt was owing by him, and he as an individual would have to make the payment to himself ... would be a perversion of the right ... Of course, *it must appear that the guardian was solvent and could have been made responsible during the currency of the second bond....* In short, it must be shown that the wards have actually suffered loss by reason of the neglect. *If it were shown that the guardian was insolvent,*

*and that at no time during the life of the second bond could the amount have been collected, the second bond would not be liable for the neglect, because no damage was done by it.*

*Id.* 57 So. at 982 (emphasis added). Thus, the fiduciary's insolvency during the term of an additional bond is a limiting principle that restricts liability for continuing breach of the duty to recover funds converted prior to its issuance. The limitation, though a somewhat intricate legal construct, is nevertheless supported by reason. In addition, all the cases that analyze, at any length, the reason for predicating liability for amounts misappropriated prior to a bond's term upon the theory of continuing breach adhere to the limitation. *See Fidelity & Deposit Co. v. Norwood*, 38 Ga.App. 534, 144 S.E. 387, 393 (1928) quoting *Aetna Indemnity Co. v. State, for use of Gallaspy*, 101 Miss. 703, 57 So. 980 (1911); *see also Owen v. McMahan*, 210 P. 200, 122 Wash. 191 (1922). Therefore, the Court reverses the bankruptcy court and rules that Duck's solvency during the terms of the Sureties' bonds is material with respect to whether he committed a continuing breach of his duty to recover assets to the estate for which the Sureties are liable.

(2) The Duty To Account.

■ The second, distinct, most common rationale for finding that later-filed, additional court fiduciary bonds cover defalcations predating their issuance is based upon the trustee's breach of his duty to account for and his duty to pay over the

assets of the estate during the term of the later-filed bond. The surety on the later-filed bond is not held liable for the defalcations or misappropriation, committed prior to the bond's issuance, *per se;* rather, the surety is held liable for the trustee's failure to account for those misappropriated or converted funds and to pay them over *during* the term of the later-filed bond.

The underlying rationale was set forth in *Bellinger v. Thompson*, 37 P. at 718. There, the court reasoned that the administrator of an estate is entitled, from the start of his term, to possession of all the property of the estate. A surety that issues a later-filed bond assumes liability upon the assumption that the trustee possesses, at that time, all the assets of the estate thus far received.[16] The surety guarantees that the trustee will faithfully perform his trust and account for the funds. If he fails to account when obligated to do so by court order or law, he has breached his duty to account for and pay over the estate funds. Bonds on the risk when the court-fiduciary breaches the duty to account for the assets are liable for any shortfall. Therefore, the overwhelming majority of the well-reasoned decisions finding later-filed, additional bonds liable for assets misappropriated prior to their issuance have based their ruling upon breach of the duty to account and to pay over the funds at issue.[17]

Therefore, the decisions generally indicate a narrower rule than the synopsis of the majority position relied upon by the bankruptcy court. This Court holds that the proper rule, as indicated by the majori-

**16.** Indeed, the surety on a additional trustee bond coming on risk mid-term can "ascertain to his own satisfaction with reference to the condition of the estate before binding himself as surety upon the bond." *In re Tabasinsky's Estate*, 228 Iowa 1102, 293 N.W. 578 (1940).

**17.** *National Surety Corp. v. Ellison*, 88 F.2d 399 (8th Cir.1937) (court-fiduciary bond conditioned generally on faithful performance of duties held liable for failure to account and breach of duty to make good even loss pre-dating the bond); *Beard v. Roth*, 35 Fed. 397 (8th Cir.1888); *Beakley v. Cunningham*, 112 Ark. 71, 165 S.W. 259 (1914) (later-filed, additional guardian's bond liable for defalcations prior to issuance because guardian has continuing duty to preserve estate

assets and to account); *Pinkstaff v. People*, 59 Ill. 148 (1871); *In re Tabasinsky's Estate*, 228 Iowa 1102, 293 N.W. 578 (1940); *Douglas v. Kessler*, 7 N.W. 613 (1880), *aff'd on rehearing* 57 Iowa 63, 10 N.W. 313 (1881) (surety on additional bond conditioned generally on faithful performance of duties liable for breach of duty to account); *Brown v. State*, 23 Kan. 235 (1880); *Choate v. Arrington*, 116 Mass. 552 (1875); *Lindquist v. Thang*, 188 Minn. 437, 247 N.W. 506 (1933); *Bromen v. O'Connell*, 185 Minn. 409, 241 N.W. 54 (1932); *Mitchell v. Columbia Cas. Co.*, 111 Mont. 88, 106 P.2d 344 (1940); *Wilkins v. Deal*, 128 Neb. 78, 257 N.W. 486 (1935); *Bellinger v. Thompson*, 26 Or. 320, 37 P. 714 (1894).

ty of decisions, is that a later-filed, additional court fiduciary bonds is liable for assets misappropriated prior to its issuance where either (1) the trustee commits a breach of the duty to recover misappropriated assets to the estate, *during* the term of the later-filed bond, when he is solvent, *or* (2) the trustee breaches his duties to account for and to pay over the estate's assets *during* the term of the later-filed, additional bond.[18]

▇ The bankruptcy court found the ultimate fact of the Sureties' liability for defalcations committed prior to their bonds' terms without finding the basic facts necessary to warrant liability under the correct rule set forth herein. To find liability based on continuing breach to recover assets misappropriated to the trustee requires the fact-finder to determine if the trustee was solvent during the term of the bonds at issue. However, the bankruptcy court did not make a factual finding with respect to Duck's solvency. Similarly, a finding that the Sureties were liable predicated upon the duty to account and pay over estate assets requires a finding that the trustee breached that duty during the term of the Sureties' bonds. The bankruptcy court did not make such a finding. Therefore, the bankruptcy court did not make the requisite factual or legal findings necessary to determine if the Sureties' bonds cover assets or amounts misappropriated prior to their issuance. Accordingly, the Court vacates the bankruptcy court's finding that the Sureties are liable for misappropriations or defalcations com-

mitted prior to the issuance of the Sureties' bonds.

## IV. CONCLUSION

In accordance with the foregoing, the Court hereby:

1. Affirms the bankruptcy court's finding of law that the Sureties' later-filed bonds were statutory bonds pursuant to 11 U.S.C. section 322(b);

2. Affirms the bankruptcy court's finding of law that the terms of the Sureties' should be read to substantially conform to Official Form No. 25 for purposes of interpreting liability;

3. Finds that federal common law governs the issue of whether a later-filed, additional trustee bond under section 322 can be held liable for estate assets misappropriated prior to the issuance of the bonds;

4. Finds that the correct federal common law rule is that a later-filed, additional court-fiduciary bond, whose language substantially complies with Official Form No. 25, is liable for assets misappropriated by the trustee prior to their issuance where: (1) the trustee was solvent at some time during the later-filed bond's term and breached his continuing duty to recover the misappropriated assets; or (2) the trustee breached his duty to account for and to pay over estate assets as required by the court or by law during the term of the later-filed bond;

5. Finds that the bankruptcy court did not make the necessary findings of basic

---

**18.** A Chapter 11 trustee is "accountable for all property received." 11 U.S.C. §§ 704(2), 1106(a)(1). A trustee that resigns or is removed must file an account and turn over all of the estate properties under his control. 2 *Collier on Bankruptcy* § 324.03, pp. 3247–8 (15th ed. 1987). The statutory scheme and pertinent Official Forms provide for trustee bonds guaranteeing the "faithful performance of his duties" generally. It is beyond question that one of these duties is the duty to account. Therefore, one purpose of section 322 is to require trustee bonds that obligate the sureties for the trustee's failure to account and to pay over the estates' assets when required to do so by law or by court order.

The majority rule set forth herein is not inconsistent with *In re Endeco,* 718 F.2d 879 (8th Cir.1983). That case addressed the distinct issue of whether a trustee's bond is one continuous contract over the period of the trusteeship, or, on the other hand, the bond is a separate contract for each year in which an additional premium is paid. The Eighth Circuit indicated the latter, which would support a view that a surety is only liable for defalcations committed during the term of its bond. Under the Court's ruling herein, a surety is liable for a breach of the duty to account, or the duty to recover misappropriated assets, that occurs *during* the term of their bond.

fact to support a finding of liability under this rule;

6. Vacates the bankruptcy court's finding that Transamerica and F & D were liable for defalcations committed prior to the issuance of their respective bonds; and

7. Remands the action for further findings of fact and law in accordance with this opinion.